EX PARTE JOE FISHER.*

No. A-1328. Decided November 12, 1947.
Rehearing overruled January 21, 1948.
(206 S. W., 2d Series, 1000.)

---

*Petition for writ of certiorari granted by the Supreme Court of the United States, May 24, 1948. 334 U. S. 827, 68 Sup. Ct. 1339, 92 L. Ed. 1047 (No. 756).

Looney & Clark, Everett L. Looney, Edward Clark, R. Dean Moorhead, Charles F. Herring, Dan Moody, and Black & Stayton, all of Austin, Collins, Dies, Williams and Garrison, J. J. Collins and Martin Dies, all of Lufkin for relator.

330

*Robert W. Hillin*, District Attorney, of Jasper, for respondent.

**PER CURIAM:**

This is an original habeas corpus proceeding in which the relator, Honorable Joe Fisher, seeks his release from an order of the district court of Jasper County, adjudging him in contempt of court, assessing a fine of $100.00 and a jail sentence of three days, and committing him to the custody of the sheriff.

The contempt order arose in the trial of a workman's compensation suit in which the relator was attorney for the claimant. The suit was by Anderson Godfrey, claimant, against the Texas Indemnity Corporation for compensation for injuries to claimant's left foot. His weekly wage rate and the compensation due per week were agree upon by the parties. The only issues remaining in controversy were those with reference to the extent and duration of the injury, and these were submitted to the jury. These issues inquired: (1) if the claimant sustained total incapacity; (2) when the total incapacity, if any, began; (3) how long it has or will continue; (4) whether claimant sustained a partial loss of the use of his foot; (5) when the partial loss of use, if any, began or will begin; (6) how long the partial loss of use, if any, has continued or will continue; and (7) what was the extent or degree of partial loss of use, if any. In the first portion of the charge the trial court gave the usual admonitory instructions to the jury, among which were that the jurors would receive the law from the court as

contained in the charge and that they must not discuss what effect any of their anwsrs should have upon the rights of the parties nor of the judgment to be rendered by the court. Thereafter, the court defined "Preponderance of the evidence," "Natural result," "Injury," "Total incapacity," and "Partial loss of use."

During his opening argument to the jury the relator began to explain the differences between a general injury and a specific injury, and stated that claimant's injury was a specific injury to his left foot for which the maximum compensation provided by law was one hundred and twenty-five weeks. He continued: "That is the most compensation Anderson Godfrey could receive, would be one hundred and twenty-five weeks, because his injury is confined to his left foot. That is all we are asking. Now, that means one hundred and twenty-five weeks times the average weekly compensation rate."

At that point Honorable Joyce Cox, counsel for the insurance company, objected because the jury was not concerned with the computation since such issues were not submitted. Thereupon, the following discourse occurred in open court:

"By the Court: That has all been agreed upon.

"By Mr. Fisher: I think it is material, Your Honor, to tell the jury what the average weekly compensation is of this claimant so they can tell where he is.

"By the Court: They are not interested in dollars and cents.

"By Mr. Fisher: They are interested to this extent—

"By the Court: Don't argue with me. Go ahead. I will give you your exception to it.

"By Mr. Fisher: Note our exception.

"By the Court: All right.

"By Mr. Fisher: This negro, as I stated, can only recover one hundred and twenty-five weeks compensation, at whatever compensation the rate will figure under the law.

"By Mr. Cox: I am objecting to that discussion, Your Honor, as to what the plaintiff can recover.

"By the Court: Gentlemen. Mr. Fisher, you know the rule, and I have sustained his objection.

"By Mr. Fisher: I am asking—

"By the Court: Don't argue with me. Gentlemen, don't give any consideration to the statement of Mr. Fisher.

"By Mr. Fisher: Note our exception. I think I have a right to explain whether it is a specific injury or general injury.

"By the Court: I will declare a mistrial if you mess with me

two minutes and a half, and fine you besides.

"By Mr. Fisher: That is all right. We take exception to the conduct of the Court:

"By the Court: That is all right; I will fine you $25.00.

"By Mr. Fisher: If that will give you any satisfaction.

"By the Court: That is $50.00; that is $25.00 more. Mr. Sheriff come get it. Pay the Clerk $50.00.

"By Mr. Fisher: You mean for trying to represent my client?

"By the Court: No, sir, for contempt of Court. Don't argue with me.

"By Mr. Fisher: I am making no effort to commit contempt, but merely trying to represent the plaintiff and stating in the argument—

"By the Court: Don't tell me. Mr. Sheriff, take him out of the courtroom. Go on out of the courtroom. I fine you three days in jail.

"By Mr. Fisher: If that will give you any satisfaction; you know you have all the advantage by your being on the bench.

"By the Court: "That will be a hundred dallar fine and three days in jail. Take him out.

"By Mr. Fisher: I demand a right to state my position before the audience.

"By the Court: Don't let him stand there. Take him out."

The above proceedings occurred in open court at 9:30 A.M. on June 17, 1947. Ten minutes later there was filed with the district clerk an order of contempt which was signed by the trial judge. No commitment was issued on that order. However, the sheriff held the relator upon the verbal order of the trial court until an amended order was filed between three and four o'clock P.M., of the same day. This amended order contained a full recitation of the above proceedings and was accompanied by a formal commitment. That order and commitment were in effect at the time we issued our temporary writ of habeas corpus, and it is upon these latter instruments that we base our decision.

 In a habeas corpus proceeding of this character this court has only limited powers. The inquiry before us is whether or not a citizen is restrained of his liberty without due process of law. In determining this matter we are restricted to the question of jurisdiction, the lack of which would render the judgment void. In passing on the court's authority we look to the jurisdiction of the subject matter involved in the alleged contempt, jurisdiction of the person, and the power of the court to render the particular judgment. Whether he committed

the act charged in conclusively determined by the order or judgment of the trial court in the proceeding wherein he is adjudged in contempt, provided that court possessed jurisdiction. We may consider the facts only for the purpose of determining whether they constituted acts sufficient to confer jurisdiction upon the court to make the particular order. Ex parte Testard, 101 Texas 250, 106 S. W. 319; Ex parte Olson, 111 Texas 601, 243 S. W. 773; Ex parte Lipscomb, 111 Texas 409, 239 S. W. 1101; Ex parte Duncan, 127 Texas 507, 95 S. W. (2d) 675; Ex parte Hughes, 133 Texas 505, 129 S. W. (2d) 270; Ex parte Genecov, 143 Texas 476, 186 S. W. (2d) 225, 160 A. L. R. 1099; Ex parte Norton, 144 Texas 445, 191 S. W. (2d) 713; Ex parte Dulaney, 146 Texas 108, 203 S. W. (2d) 203; 25 Am. Jur. 212, Sec. 92; 39 C. J. S. 539-545, Sec. 36.

In the Testard case, supra, in discussing our powers in proceedings of this character, this court said:

"This is not an appeal from the judgment of the district court, but an application for the release of the relator, which can be sustained only by making it appear that the judgment is void. * * * The judgment, therefore, is valid against collateral attack, and no amount of evidence offered before this court, tending to show that the relator was in fact innocent of the charge, can now avail him. The question of his guilt or innocence was for the trial court, and was concluded by its judgment pronounced after a hearing."

That particular language from Judge Williams was quoted with express approval by this court in both the Duncan and Norton cases, supra, wherein in each case similar rules of law were applied.

With these principles in mind we must determine whether the conduct of the relator was such as to invoke the jurisdiction of the court to enter the particular order herein involved. In passing on this question we must consider the proceedings as a whole and not merely isolated portions thereof. If there is any conduct or behavior of the relator contained in the whole proceedings sufficient to constitute a contempt which was within the power of the court to punish, our inquiry comes to an end. Of course, if from our examination of the entire proceedings it appears that the trial court exceeded its powers in making the order which the relator disobeyed or where the act charged was not one which it had the power to punish as a contempt, the alleged misconduct would not as a matter of law constitute a contempt, and the relator would be entitled to be discharged.

334

From the judgment of contempt it appears, as above indicated, that the relator began to explain to the jury that his client had suffered a specific injury to his foot for which he stated that the maximum compensation provided by law was one hundred and twenty-five weeks. He further informed the jury that such amount was all his client was asking, which he said meant "one hundred and twenty-five weeks times the average weekly compensation rate." Objection was made to that argument on the ground that the jury was not concerned with the computation since those issues were not submitted. The objection was sustained. The relator responded that he thought it was material "to tell the jury what the average weekly compensation is of this claimant so they can tell where he is." The court replied that the jury was not interested in dollars and cents, and for counsel to go ahead and reserve his exception. Notwithstanding the specific orders of the court, and apparently in defiance thereof, the relator repeated to the jury that his client could recover only "one hundred and twenty-five weeks compensation at whatever compensation the rate will figure under the law." Objection was again made, and the court admonished the relator of his knowledge of the rule and of the fact that the objection to the argument had theretofore been sustained. Then there ensued that unfortunate and regrettable dialogue between the relator and the trial judge which resulted in the infliction of punishment against the relator.

■ It is obvious that the relator was attempting to inform, and did inform, the jury what the law is with reference to the rights of his client, which was calculated to inform them of the legal effect and result of their answers to the issues submitted. That such conduct and practice is to be condemned under our law of submitting cases upon special issues, cannot be doubted, unless, unlike the circumstances in the court below, the issues are such that men of ordinary intelligence would be presumed to know the legal effect of their answers. Galveston, H. & S. A. Ry. Co. v. Harling, Tex. Com. App., 260 S. W. 1016; McFaddin v. Hebert, 118 Texas 314, 15 S. W. (2d) 213; City of Dallas v. Firestone Tire & Rubber Co., 66 S. W. (2d) 729, writ refused. As was said in the McFaddin case, supra, "the prime object, purpose, and intent of the law for submitting cases on special issue is to remove the jury from any bias in favor of, or prejudice against, either party to the suit, to relieve them from the duty of directly passing on who shall prevail in the suit, and to make it the duty of the jury to answer each question truly as they find the facts to be from the evidence, without regard to what the results of their answers may be."

■ In keeping with the purpose and spirit of the law of special issues, Rule 269, T. R. C. P., provides that arguments on questions of law shall be addressed to the court, and arguments on the facts should be addressed to the jury. It also provides that counsel shall be required to confine the argument strictly to the evidence and the arguments of opposing counsel.

In Ramirez v. Acker, 134 Texas 647, 138 S. W. (2d) 1054, 1055, this court had this to say with reference to the scope of legitimate argument before the jury:

"The rule has long been in force in this State that 'counsel shall be required to confine argument strictly to the evidence and to the argument of opposing counsel.' See Rule 39, relating to district and county courts. The scope of argument by counsel to the jury is always under the supervision of the court. It is the duty of the court to maintain decorum during the trial of a case, and to require counsel to limit argument to the facts in evidence. Great latitude is allowed counsel in discussing the facts and issues. Counsel are permitted to show the environments of the case; they may comment upon the bias or interests of the parties and witnesses, and may discuss the reasonableness or unreasonableness of the evidence and its probative effect or lack of probative effect; but such latitude extends only to the facts and issues raised by the evidence in the case. It is only by adhering strictly to this rule that the rights of litigants can be protected and the law administered justly and impartially."

■ Measured by these rules it appears obvious to us that the above argument and conduct of counsel was peculiarly within the control, direction and jurisdiction of the trial court. It was the duty and power of the trial judge in the trial of the compensation suit to determine the type, manner and character of the argument before the jury. Of course his rulings thereon were subject to review in the appellate courts, but he has the power to make them whether right or wrong. If they are erroneous the injured party has the plain, simple and adequate remedy of appeal. It was thus the duty of counsel to abide by his decisions even if erroneous; and if any rights of his clients were violated the remedy was by exception and appeal. Any other procedure would result in mockery of our trial courts and would destroy every concept of orderly process in the administration of justice. Consequently, we hold that the court acted clearly within its jurisdiction and, therefore, the judgment of contempt cannot be impeached in this collateral proceeding.

336

The order granting the temporary writ of habeas corpus is set aside, and the relator is remanded to the custody of the sheriff of Jasper County to carry out the judgment of the trial court.

Opinion delivered November 12, 1947.

Rehearing overruled January 21, 1948.

MR. JUSTICE SHARP, dissenting.

A question highly important to the bench, bar, and litigants is involved in this case. If, based upon the facts of this case, the majority opinion becomes the settled law of this State, then a trial judge by the exercise of arbitrary power could prevent an attorney from representing his client in a case on trial according to the duty which he owes his client.

The question for determination by this Court is whether the undisputed facts embraced in this record show that the trial judge was justified in finding relator guilty of contempt, and whether he was authorized to enter judgment for contempt for relator's conduct and acts.

The facts upon which the trial judge based his judgment for contempt are now before this Court. In order to clearly present the facts upon which the trial judge entered judgment, I quote, supplemental to the facts embraced in the majority opinion, the following from relator's brief:

"In this case Relator was engaged in the argument of a workmen's compensation case before a jury. After stating to the jury that the injury involved was a specific injury, the Relator continued:

" 'the law states the amount of maximum compensation which a person can receive for such an injury, that is, one hundred and twenty-five weeks. That is the most compensation Anderson Godfrey could receive, would be one hundred and twenty-five weeks, because his injury is confined to his left foot. That is all we are asking. Now, that means one hundred and twenty-five weeks times the average weekly compensation rate.'

"At this point Relator was interrupted by Mr. Joyce Cox, one of the opposing counsel—the opposing counsel consisting of Mr. Cox, Mr. John G. Seaman, and the trial judge's son, Mr. T. Gilbert Adams—and the following discussion ensued:

(I omit certain facts embraced in the majority opinion.)

"In his original judgment of contempt, the trial judge stated that:

" 'The Court instructed the attorney for plaintiff, Joe J. Fisher, not to proceed further in the manner in which he was arguing the case and he continued and the Court assessed a fine of $25.00; he continued in his discussion and the Court raised the fine to $50.00; and on further discussion he still refused to recognize the Court's authority or orders and the Court fined him $100.00; and he still persisted in his efforts and the Court assessed his fine at three days' confinement in the county jail in addition to the $100.00 fine, for contempt of court.'

"In his so-called 'amended order,' the trial judge stated that:

" 'And the Court having ruled that said argument was improper and having ordered the said Joe J. Fisher to refrain from making same he, the said Joe J. Fisher, then in the immediate view and presence of the Court and jury continued to make such argument in gross disrespect of the Court, its orders and its authority and did thereby willfully interrupt the business of the Court and impair respect to its authority, and the said Joe J. Fisher was forcibly removed from the Court by Deputy Sheriff Martel Mixon, and the said Joe J. Fisher being now still present, it is Ordered and Adjudged that he, the said Joe J. Fisher, is guilty of contempt of Court in so refusing to abide the ruling of the Court and in arguing with the Court and in manifesting disrespect for the Court, its authority and its orders; and it is further Adjudged that the said Joe J. Fisher as his punishment for said contempt be imprisoned in the jail of the County of Jasper for the term of three days and pay a fine to the Clerk for the use of the State of Texas in the sum of $100.00 and that he, the said Joe J. Fisher be committed to the jail of said Jasper County until said fine is paid or until he be discharged therefrom according to law.' "

In the order of the court it appears that the acts of relator on which the judge based his contempt order occurred before the court at 9:30 o'clock A. M. on June 17, 1947, at which time the original order was made, and the sheriff held relator under a verbal order of the trial court under such original order. The amended judgment was filed with the clerk at 3:25 o'clock P. M. on June 17, 1947. The sheriff's return shows that he received the order of commitment based upon the amended order at 3:45 o'clock P. M. on June 17, 1947, and executed it at the same time. The sheriff's telegram, which was before this Court

at the time the writ of habeas corpus was granted, shows *that* it was sent from Jasper at 3:40 o'clock P. M. on June 17, 1947, and was received at Austin at 4:01 o'clock P. M. on the same day, and it shows that the sheriff held relator in custody at that time under verbal direction of the court and no writ of commitment had been issued or delivered. The telegram reads as follows:

"I hold Joe J. Fisher in custody for contempt of court ordered by Judge F. P. Adams. No writ of commitment has been issued or delivered to me and I hold him under oral direction to me (by) the judge to do so."

The writ of habeas corpus was granted by this Court under Article 1737, Revised Civil Statutes, on June 17, 1947, but the hour at which it was granted is not shown in the record. I shall assume that both orders were filed before the writ of habeas corpus was granted by this Court.

Relator vigorously attacks the judgment of contempt entered in this case, substantially on the following grounds:

1. As a matter of law relator was not guilty of contempt.

2. The uncontroverted facts clearly show that relator was not guilty of contempt.

3. Relator is entitled to be released because of the absence of a valid order of contempt or commitment thereunder.

In this State it has been held "that in order to justify the court to fine for contempt three things are necessary: (1) Jurisdiction of the subject matter; (2) jurisdiction of the person; and (3) the authority of the court to render the particular judgment. 9 Tex. Jur., p. 641, and cases cited." Ex parte Britton, 127 Texas 85, 92 S. W. (2d) 224; Ex parte Duncan, 127 Texas 507, 95 S. W. (2d) 675.

The courts were created for the principal purpose of furnishing litigants a tribunal in which to present their claims and settle their disputes in accordance with law and justice. Litigants are entitled to be represented by attorneys of their own choice. It is well known that rules relating to procedure in the trial of cases are complicated. It is also true that certain cases, especially those concerning the Workmen's Compensation Law, present serious problems, not only for the court, but also for the attorneys and the jury. The right of an attorney to appear and represent his client is well fixed in the jurisprudence of

this State. An attorney is an officer of the court and the relationship between the court and attorneys is reciprocal. In their respective spheres they both have certain rights, and the rights of the one should be recognized and respected by the other. It is the duty of a judge to preside in the trial of a case and conduct his court in a proper and orderly manner, and it is the duty of an attorney representing litigant to present his client's interest to the court and to the jury. This is essential if courts are to function and administer justice in an orderly manner. A judge should conduct himself in a dignified manner, and see that all parties are treated impartially and that the law and justice are administered without bias or favor. It is only in rare instances that this rule is violated. An attorney should be respectful to the judge and his rulings, and if he should abuse this duty, he should be adjudged in contempt.

It is our boast that our courts and our attorneys are and should be independent. It has been aptly said that, "The independence of the bar is the only unfailing safeguard of justice and of the liberty without which justice is but a name." An attorney would not be true to his profession and his duty to his client if he did not present his client's cause to the court and the jury with all the ability that he possesses. In doing so he is merely living up to the tradition of his profession. This right should not be taken from an attorney or a client except for good cause shown.

Contempts of court are classed as constructive or direct. Constructive contempt is tested by acts or words outside the presence of the court; and direct contempt consists of words spoken or acts committed in the presence of the court. 12 Amer. Jur., p. 390, sec. 4.

This case is for direct contempt of the trial court. The recent case of Ex parte Norton, 144 Texas 445, 191 S. W. (2d) 713, involved a judgment of direct contempt, entered by the trial court against an attorney, and in passing on the authority of the judge to enter the judgment this Court said:

"In ascertaining whether the acts and conduct of relator in the presence of the court justified the court in holding him guilty of contempt, we must take into consideration all of the facts and circumstances concerning this case. The case was pending before the judge for determination, and he had jurisdiction of the cause and the parties thereto."

It was also further said:

"In the judgment, the judge specified the acts and conduct of relator which caused him to hold relator in contempt of court and issue the commitment. It is quite plain from the record that relator knew that the judge felt that his orders were being disobeyed, and he also knew that the judge considered that relator, by his conduct and improper remarks, was disrespectful concerning the dignity and authority of the court. Relator in open court expressed his indifference as to what the court might hold or do on account of his remarks and conduct, and later did not try to purge himself of his improper remarks and misconduct, although he was given ample opportunity to do so."

In this instance a case arising under the Workmen's Compensation Law was being tried. It is undisputed that the method of procedure in compensation cases is complicated, and the form of special issues to be submitted to the jury by the trial court has given this Court grave concern, and the rules have been amended from time to time in order to clarify the questions so that the trial courts, attorneys, and juries may not be confused. The court had submitted several issues to be answered by the jury. The attorneys had a right to argue those issues to the jury in order that they might understand and intellingently answer them. Great latitude is allowed counsel in discussing the facts and issues in a case.

Now let us analyze the facts as shown by the record. It clearly appears that relator was trying to explain to the jury the rights and claim of his client. He contended that he thought "it was material to tell the jury what the average weekly compensation is of this claimant, so they can tell where he is." The judge interrupted relator and indicated his ruling upon this question:

"By the Court: They are not interested in dollars and cents.
"By Mr. Fisher: They are interested to this extent . . . . . .
"By the Court: "Don't argue with me. Go ahead. I will give you your exception to it.
"By Mr. Fisher: Note our exception."

Relator obeyed this ruling. He told the jury that plaintiff could only recover for 125 weeks "at what-ever compensation the rate will figure under the law." This statement does not indicate that relator was disobeying the ruling of the court, but, on the contrary, shows that he was trying to obey same. The judge again interrupted relator, and said:

"Gentlemen: Mr. Fisher, you know the rule, and I have sustained his objection.

To what rule did the judge refer? The objection sustained related to "dollars and cents." Relator replied:

"I am asking . . . . ."

The court then said:

"Don't argue with me. Gentlemen, don't give any consideration to the statement of Mr. Fisher."

It is very difficult to conceive why relator did not have the right to make this statement.

Then followed this colloquy between the judge and relator:

"By Mr. Fisher: Note our exception. I think I have a right to explain whether it is a specific injury or general injury.

"By the Court: I will declare a mistrial if you mess with me two minutes and a half, and fine you besides.

"By Mr. Fisher: That is all right. We take exception to the conduct of the Court."

Upon this state of the record at that time the court fined relator $50.00 and ordered the sheriff to collect the fine. The relator then asked the court why he was fined, and the record then disclosed the following:

"By Mr. Fisher: You mean for trying to represent my client?

"By the Court: No, sir; for contempt of Court. Don't argue with me.

"By Mr. Fisher: I am making no effort to commit contempt, but merely trying to represent the plaintiff and stating in the argument - -

"By the Court: Don't tell me. Mr. Sheriff, take him out of the courtroom. Go on out of the courtroom. I fine you three days in jail.

"By Mr. Fisher: If that will give you any satisfaction; you know you have all the advantage by you being on the bench.

"By the Court: That will be a hundred dollar fine and three days in jail. Take him out."

Just what order of the court did relator disobey that authorized the court to fine him $100.00 and have the sheriff confine him in jail for three days? The court ordered relator not

to discuss the question of "dollars and cents," and there is nothing in the record to show that he disobeyed that ruling. During the colloquy the judge made this unusual statement, which I repeat:

"I will declare a mistrial if you mess with me two minutes and a half, and fine you besides."

To this statement relator took exception. The language of the judge was not in keeping with the dignity of the court. Judges, like attorneys, are human, and are not always infallible. Frequently, during a trial, attorneys may become overzealous in representing their clients, and it is the duty of the court, without bias, partiality, or vindictiveness, in a dignified manner, to see that order is maintained during a trial. This Court announced the rule that "The power to punish for contempt will be exercised with great caution, and only as a preservative, and not as a vindictive measure." Herring v. Houston Nat'l Exchange Bank, 113 Texas 337, 255 S. W. 1097.

I have already stated the condition of the record when this Court granted relator a writ of habeas corpus. The two judgments of the court speak for themselves. The first order was the one under which the sheriff took relator under custody. No commitment was issued at the time. This order of contempt contains no recital of facts upon which the alleged contempt was based. Unquestionably the original order and the proceedings thereunder were void. The rule is stated in 9 Tex. Jur., 631, as follows:

"There must be a recital of all the facts necessary to confer jurisdiction to inflict punishment. Thus a judgment against an attorney has been held not to be sustainable in a direct habeas corpus proceeding where neither the judgment of contempt nor the commitment thereunder shows the nature of the contemptuous act or utterance.." See also Ex parte Bullington, 66 Texas Crim. Rep. 256, 145 S. W. 1190; Ex parte Miller, 244 S. W. 613; Ex parte Crenshaw, 96 Texas Crim. Rep. 654, 259 S. W. 587, 31 A. L. R. 1181.

·I quote the following from 9 Tex. Jur., p. 633:

"Confinement, upon verbal order, prior to the entry of judgment of contempt and the issuance of a writ of commitment, is illegal, and the court is without power to order the issuance of such writ after the appellate court has granted a writ of habeas corpus. The commitment will not be held invalid, however,

where all the record proceedings have been entered before the writ of habeas corpus is granted." For a full discussion of this rule see the cases cited in the footnotes."

The amended order embraced the facts upon which the final commitment was issued, and I shall assume that this order was filed before the writ of habeas corpus was granted by this Court. I do not think the facts set out in the amended order will support the judgment of contempt, and their sufficiency should be tested by the decisions of the courts relating to habeas corpus proceedings.

.- The Court of Criminal Appeals in the Crenshaw case, supra, held that the facts involved in that case did not sustain contempt of the court, and said:

"Relator was engaged in the defense of his client, and it seems without dispute that, in the execution of what must be regarded by every attorney as his sworn duty, he wished to state his exceptions to language used by the court in remarks accompanying his ruling. As substantially stated above, the language of the court may or may not have been exceptionable,—we are not concerned with this question—but the fact remains that the right to except to such remarks was inviolable."

In ex parte Miller, supra, the Court of Criminal Appeals, in discussing the facts, said:

"It is true that the dignity of the courts is to be upheld and decorous conduct and language greatly become the advocate at the bar, but the right of free speech and of full representation by counsel guaranteed to one accused of crime is of serious weight, and much caution should be exercised in any case that these rights be not infringed or denied by reason of the fact that the person under discussion or criticism is the learned trial judge, and the thing legitimately under fire is his action."

Again, in the case of Ex parte Bullington, supra, it was said:

"Under the evidence adduced on this hearing, we do not think his conduct would constitute a contempt of court. He had a right in his argument to state to the jury his theory of the law, and to argue whether or not the evidence would render his client liable for damages."

In the Texas Law Review, Vol. 8, p. 110, there is an article written by Charles G. Russell on "Review of Contempt Judg-

ments on Habeas Corpus proceedings," and I quote the following therefrom:

"The Texas rule seems to be well settled that the factum of contempt must be found, and that 'if no judgment would be justified under the given state of facts, then the judgment would be void and subject to be set aside on habeas corpus; and the rule is further laid down that we can go behind the judgment of the court to ascertain these facts.' Also, the recitals in the judgment or order of commitment are not conclusive of the authority of the trial court, but the truth of these recitals may be looked into, for the purpose of determining whether the facts stated amount to contempt. The court cannot make contempt of that which is not contempt. * * * It would seem that the Texas courts have adopted a common sense view of preserving a balance between the power of the courts to punish for contempts, and the right of the individual to liberty guaranteed by the Constitution. The fact that a court has the inherent power to punish for contempt and can punish in a great variety of cases in order to uphold its dignity and to compel obedience to its orders and decrees, does not mean that such power is unlimited. The better rule would seem to be that on habeas corpus the court will examine the record, and determine whether the facts recited constitute contempt; if they could not amount to contempt then the trial court exceeded its auhority, and the judgment can be set aside on habeas corpus."

As I understand the majority opinion, it holds that the relator is not entitled to obtain any relief in this Court under habeas corpus proceedings, regardless of the lack of any probative evidence in the record showing that he was guilty of any contempt. The leading case cited to sustain this holding is Ex parte Testard, 101 Texas 250, 106 S. W. 319. That case involved a judgment of the trial court in a constructive contempt proceeding. Relator in that case was charged with violating an injunction issued by the trial court, and a trial was had thereon. Mr. Justice Williams wrote the opinion of this Court in that case, and after stating certain facts said: "The petition and the writ in this case undoubtedly stated a case in which, under the decision referred to, the right to the injunction existed, and the ticket which relator is charged with selling fell within the class thus protected." Further facts involved in that case were discussed, and he further said: "No irregularity sufficient to invalidate the proceedings appears upon their face." After further discussion of the law and facts, it was further said: "It may be that if it conclusively appeared that oppor-

tunity was denied to relator to adduce evidence in his defense, *or that the court convicted him without any evidence whatever of his guilt*, that this would justify the conclusion that there was not such a hearing as was essential to the validity of the judgment. The determination of questions like this which might be made in cases that might be supposed is unnecessary here, *for the reason that they could only be determined from the proceedings, all of the proceedings, before the trial court, and no effort has been made to reproduce before us those had in the present case beyond the written record already stated.* * * * An attack based upon the charge that a hearing was denied, or that a conviction was adjudged without any evidence, necessarily depends for its success upon what was done in the trial court and must be supported by a showing of all that occurred there. No attempt at such a showing has been made and we must presume that there was a hearing, that opportunity to adduce evidence was allowed, and that there was evidence tending to support the conclusion of the court expressed in the judgment." (Emphasis mine.) Based upon the record and a lack of the statement of facts, and no attack being made upon the sufficiency of the evidence, the Court held that it was a collateral attack upon the judgment, and no amount of evidence not embraced in the record offered in this Court tending to show the guilt or innocence of relator could be considered by this Court.

The other cases cited in the majority opinion show facts different from the facts involved in this case. The Testard, Olson, Duncan, and Genecov cases involved judgments of contempt based upon violating an injunction. The Lipscomb case involved the right of an attorney to refuse to testify on account of being an attorney for one of the parties to the suit. The Hughes case involved an effort of the State to enforce the usury laws, and this Court released Hughes on a writ of habeas corpus. In the Dulaney case, Dulaney was found guilty of contempt for violating an order to produce in court a certain promissory note. The record in the Norton case embraced facts upon which the trial judge entered an order of contempt, and this Court reviewed the evidence, as shown by the opinion.

Here the judgment of contempt sets out completely the facts upon which the judgment is based, and they are relied upon to furnish the reason and authority for the trial judge to adjudge relator in contempt of the court. Relator has not refused to testify in the case, nor has he been adjudged in contempt for refusing to testify or for violating some injunction issued

by the court. This is no appeal from the rulings of the trial court on the merits of the case, or for the correcting of errors of the trial court in the admission or exclusion of evidence. This Court will not consider such questions in habeas corpus proceedings. This record shows that relator was adjudged in contempt of the court for taking an exception to the remarks of the court.

The facts involved in this case should be considered in passing upon the authority of the trial court to enter the order of contempt. They are the very heart of the controversy, and are embraced in the judgment. I do not think that this Court meant to hold, or did hold under the cases cited involving habeas corpus proceedings, that it was powerless to review the very facts upon which the order rests, or lack of facts to support the order, when attacked as here. If that be the rule, then a contempt order need have no facts to support it, and the trial judge would be at liberty to act as he pleased, and no relief could be obtained by writ of habeas corpus against the vindictiveness of the judge.

Relator had the right and it was his duty to take an exception to the statements of the court, if he desired to preserve the point for future proceedings. It seems that the judge was offended by the exception made by relator and proceeded to order the sheriff to take relator into custody and remove him from the courtroom; that he fined relator $100.00, and, in addition thereto, ordered that relator serve a term of three days in jail.

It seems to me that the majority opinion is inconsistent in its holdings. It first holds that this Court is powerless to review the evidence embraced in the judgment of contempt in order to say whether the trial court was authorized under the facts to find the relator guilty of contempt, and then it proceeds to consider the evidence, passes upon the sufficiency of same, and condemns relator for his acts. If the first holding is correct, then the second holding is beyond the power of this Court, and is pure dictum.

The majority opinion further states: "Then there ensued that unfortunate and regrettable dialogue between the relator and the trial judge which resulted in the infliction of punishment against the relator." The facts and holding on this point emphasize the importance of the question under consideration. Every pereson is entitled to have his case tried before a fair and impartial judge. Here relator was not entitled to a jury

in his case, and was adjudged in contempt by a judge who was a party to the "unfortunate and regrettable dialogue." This is no appeal from the merits of the case, and if, in spite of the acts of the court, the jury answered the issues favorably to plaintiff and judgment was entered in his favor, plaintiff would have no need of taking an appeal. However, that does not relieve the relator of this judgment of contempt entered by a judge who had lost his judicial poise and fairness. The evidence shows that the judge became the aggressor, and relator should not have been held in contempt of the court.

When all the facts and circumstances surrounding this case are considered, it is clear that relator was not guilty of contempt, and the judge was not authorized to enter the order of contempt. Therefore I dissent from the majority opinion, and relator should be discharged.

Opinion delivered November 12, 1947.